AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of New Jersey

| | |
|---|---|
| United States of America<br>v.<br>JULIANA GOMES-SOUZA<br><br>*Defendant(s)* | Case No.<br>Mag. No. 22-2033 (AMD) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __2018 to present__ in the county of __Burlington and elsewhere__ in the _____ District of __New Jersey__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 371 | See Attachment A |

This criminal complaint is based on these facts:
See Attachment B

☑ Continued on the attached sheet.

_____
Complainant's signature

Special Agent Lawrence Clifton Jr., IRS-CI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __6/8/2022__

_____
Judge's signature

City and state: __Camden, NJ__   Hon. Ann Marie Donio, U.S. Magistrate Judge
*Printed name and title*

CONTENTS APPROVED
UNITED STATES ATTORNEY

By: _____

David E. Malagold
Assistant U.S. Attorney

Date: June 7, 2022

## ATTACHMENT A

### COUNT ONE

**(Conspiracy to Fail to File Currency Transaction Reports and Operate an Unlicensed Money Transmitting Business)**

From at least as early as in or around 2018, through the present, in Burlington County, in the District of New Jersey, and elsewhere, defendants

> LUCIANA MACHADO, and
> JULIANA GOMES-SOUZA

did knowingly and intentionally conspire and agree to commit offenses against the United States, and committed acts to further the objects of this conspiracy, namely:

> (a) to cause a domestic financial institution to fail to file a report required under section 5313(a), that is Currency Transaction Reports, contrary to Title 31, United States Code, Sections 5324(a) and 5322; and
>
> (b) to conduct, control, manage, supervise, direct and own all and part of an unlicensed money transmitting business, that is, a money transmitting business which affects interstate and foreign commerce that is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or felony under State law, contrary to Title 18, United States Code, Sections 1960(a) and 1960(b)(1)(A).

All in violation of Title 18, United States Code, Section 371.

## ATTACHMENT B

I, Lawrence Clifton, Jr., am a Special Agent with the Department of Treasury, Internal Revenue Service, Criminal Investigation ("IRS-CI"). I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and items of evidence. Where statements of others are related herein, they are related in substance and part. Because this Complaint is being submitted for the sole purpose of establishing probable cause to support the issuance of a complaint and arrest warrant, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### A. Legal Background

1. Based on my training, experience and participation in this investigation, I am aware of the following about the regulation of check cashers:

   a. Check cashers are considered money transmitters under federal law and are subject to federal regulations if they do substantial business in the United States. See 31 U.S.C. § 5330(d)(1).

   b. Federal regulations require a check casher to register with the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") as a money transmitting business, see 31 C.F.R. § 1022.380, and to report movements of United States Currency of more than $10,001 in Currency Transaction Reports ("CTRs") to the federal government, see 31 U.S.C. § 5313.

   c. Pursuant to the laws of both New Jersey and Pennsylvania, it is punishable as a felony to operate a check cashing business that cashes checks for a fee without first obtaining a license from the appropriate state authority.

### B. Relevant Entities

2. Via Brazil LLC ("Via Brazil I") is a licensed check cashing business located in Riverside, New Jersey. Via Brazil I has registered with the U.S. Treasury Department as a "Money Services Business" engaged in "Check Cashing" and "Money Transmitter" services. Defendant **Luciana Machado** ("**Machado**") is the owner and operator of Via Brazil I.

3. Via Brazil II LLC ("Via Brazil II") is an unlicensed check cashing business located in Philadelphia, Pennsylvania.

   a. Via Brazil II has registered with the U.S. Treasury Department as a "Money Services Business" engaged in "Money Transmitter" services, but not as engaged in check cashing services. This means that Via Brazil II has registered to engage in the wiring and transfer of funds on behalf of customers from Via Brazil II to other locations. However, Via Brazil II has not registered to engage in check cashing and does not hold a license to engage in the business of check cashing in Pennsylvania.

   b. The City of Philadelphia denied an application from Via Brazil II to operate a check cashing business at its location on or about June 18, 2018, and the appeal of this denial was rejected on or about December 5, 2018.

   c. The business license issued by the City of Philadelphia has licensed the location as "Food Establishment, Retail Permanent Location."

   d. The Pennsylvania Department of Banking and Securities has not issued the required check cashing license to Via Brazil II or any other business at its address.

   e. **Machado** and defendant **Juliana Gomes-Souza ("Gomes-Souza")** are co-owners of Via Brazil II.

4.  Company 1 is a licensed check cashier located in Penndel, Pennsylvania. CC1 is the owner of Company 1.

## C. The Investigation

5.  This investigation has shown that **Machado** and **Gomes-Souza** have operated and continue to operate Via Brazil I and Via Brazil II as an enterprise that cashes a large volume of checks for customers in a manner that hides the true identity of the customers receiving the cash and fails to comply with the licensing and reporting requirements of federal, New Jersey, and Pennsylvania law.

6.  **Machado**, **Gomes-Souza**, and their co-conspirators run their criminal scheme in several ways. First, they fail to file required CTRs and Suspicious Activity Reports ("SARs") for checks cashed at Via Brazil I. Via Brazil I is licensed in New Jersey and maintains what purports to be a written anti-money laundering compliance program. However, as set forth below, there is probable cause to believe that the **Machado**, **Gomes-Souza**, and their co-conspirators willfully fail to follow the written compliance program and do not in fact comply with state and federal laws. Records received during the investigation reveal that **Machado** and employees at Via Brazil I have received

training in CTR Reporting, SAR Reporting, Bank Secrecy Act Regulations and maintaining Anti-Money Laundering Programs, all of which **Machado** and her employees fail to follow and uphold, as required by federal law.

7. Second, **Machado** and **Gomes-Souza** operate Via Brazil II in Philadelphia as an illegal and unlicensed check cashing business.

8. Third, **Machado**, **Gomes-Souza**, and their co-conspirators obtain the cash used in their unlawful enterprise from Company 1, a licensed check cashier in Penndel, Pennsylvania. On an almost daily basis, employees and agents of Company 1 deliver hundreds of thousands of dollars in cash to **Gomes-Souza**, **Machado**, or one of their employees in an alley behind Via Brazil II in Philadelphia. Further, the Company 1 employees receive customer checks from both Via Brazil I and Via Brazil II, and these checks are cashed through Company 1's bank account. CC1, on behalf of Company 1, then files false CTRs with the United States Treasury. While the cash is generally delivered to the unlicensed company, Via Brazil II in Philadelphia, each CTR filed by CC1 falsely identifies the licensed company, Via Brazil I in Riverside, New Jersey, as receiving the cash.

9. Through this scheme, hundreds of customers of Via Brazil I and Via Brazil II are able to cash checks above the reporting threshold of $10,001 without any of the required filings. Between 2019 and April 2022, **Machado**, **Gomes-Souza**, and CC1 have cashed over $175 million in CTR reportable third-party check transactions. None of the identified transactions were reported to FINCEN by **Machado**, **Gomes-Souza**, CC1 or any of their companies as required. According to FINCEN records, members of the conspiracy cashed approximately $106,757,514 CTR reportable check cashing transactions in 2019, $85,827,061 in 2020, $75,719,875 in 2021, and $24,247,068 from January 3, 2022 through April 29, 2022.

10. Financial records show that the vast majority of CTR reportable third-party check transactions are checks not payable to Via Brazil I or Via Brazil II customers. Rather, the checks are written to corporate entities, largely shell corporations with corporate names related to the construction and building trades industry. The customers are allowed by the **Machado, Gomes-Souza** and their employees and co-conspirators to cash checks against these shell companies. By obtaining cash in this manner, customers of Via Brazil I and Via Brazil II are able to avoid financial records and required FINCEN reports (CTRs and SARs) from being traceable to them directly. This frequently furthers these customers' ability to pay cash wages to off-the-books labor, and avoid tax-reportable income.

11. During this investigation, a confidential informant ("CI-1"), has provided information regarding Via Brazil I and Via Brazil II. At the direction of law enforcement, CI-1 has conducted undercover check cashing transactions at

Via Brazil I and Via Brazil II. Each time, CI-1 was equipped with a recording device.

12. According to CI-1, individual customers known or trusted by **Machado** and/or **Gomes-Souza** can cash checks for large amounts at Via Brazil I and Via Brazil II. These customers cash checks made payable to shell companies rather than the customers themselves. The customers can acquire authority to cash checks payable to the shell companies from individuals in the community. Typically, the customers are involved in the construction and buildings trade industry, and the shell companies have names typical of companies in this industry.

13. At the direction of law enforcement, CI-1 cashed CTR reportable checks at Via Brazil I and Via Brazil II. On each occasion, CI entered either Via Brazil I or Via Brazil II and presented a check for cashing. CI-1 never showed identification, nor was CI-1 ever asked to do so. Each time, Via Brazil I or Via Brazil II personnel took the check and gave CI-1 the cash (minus the check cashing fee). The checks presented by CI-1 were payable to a shell corporation using a construction-related name. Further, the checks were written from an account with a construction company name controlled by IRS-CI through an undercover bank account.

14. Between late 2018 and late 2021, CI-1 cashed checks in this manner on at least four occasions each at Via Brazil I and Via Brazil II. In the ordinary course of business, IRS-CI received customer records from the bank for the undercover account. These records included copies of checks cashed by CI-1 at Via Brazil I and Via Brazil II. Examination of these records showed the backs of the checks were not endorsed by Via Brazil I, Via Brazil II, or any of the owners or employees. Rather, each check was deposited into the bank account of Company 1. CI-1 never conducted any business at Company 1.

15. A review of CTR filings show that none of the CTR reportable checks cashed by CI-1 at Via Brazil I or Via Brazil II were reported to FINCEN as required.

16. A review of CTR filings submitted to FINCEN by CC1 on behalf of Company 1 shows that Company 1 also did not file CTRs on CI-1's reportable checks. Instead of reporting the checks individually, Company 1 reported to FINCEN a large sum of cash delivered to Via Brazil I and **Gomes-Souza**.

17. For example, on or about November 29, 2018, CI-1 conducted an undercover transaction at the direction of law enforcement. CI-1 traveled to Via Brazil II to negotiate a check made payable to a known shell company utilized in this scheme. CI-1 met directly with **Machado**. At the window, **Machado** took the check, in excess of $10,001, from CI-1 and photocopied the check. **Machado** had CI-1 sign and provide CI-1's phone number on the

photocopy of the check. **Machado** then photocopied the check and placed the original check in a white envelope where other checks were already present. The envelope was placed in a drawer underneath the cash register. **Machado** then directed CI-1 to the kitchen area of Via Brazil II to count the money. **Machado** also gave CI-1 a business card which listed both the Via Brazil I and Via Brazil II locations. **Machado** charged CI-1 a 1.75% check cashing fee and delivered the remaining amount to CI-1. **Machado** never asked CI-1 for identification during the transaction or for any pedigree information. No CTR for this transaction was ever reported to FINCEN as required. The check in question was not deposited into any check cashing accounts held by **Machado**, **Gomes-Souza**, Via Brazil I, or Via Brazil II. Instead, the check was deposited into a check cashing account held by Company 1.

18. On or about May 6, 2019, CI-1 conducted an undercover transaction directed by law enforcement. CI-1 traveled to Via Brazil II to negotiate a check made payable to a known shell company utilized in the check cashing scheme. CI-1 met directly with **Gomes-Souza**. At the window, **Gomes-Souza** took the check in excess of $10,001 from CI-1. **Gomes-Souza** told CI-1 that she was waiting for a cash delivery and made CI-1 wait until the cash arrived. When the cash arrived, **Gomes-Souza** gave CI-1 the cash, minus the 1.75% check cashing fee. **Gomes-Souza** never asked CI-1 for any identification or pedigree information. No CTR was ever filed for this transaction. The check was not deposited into any accounts held by **Machado**, **Gomes-Souza**, Via Brazil I, or Via Brazil II. Instead, the check was deposited into a check cashing account held by Company 1.

19. On or about September 22, 2021, CI-1 conducted an undercover transaction directed by law enforcement. CI-1 traveled to Via Brazil I to negotiate an undercover check made payable to a known shell company. CI-1 met directly with **Machado**. At the window, **Machado** took the check in excess of $10,001 from CI-1 and photocopied the check. **Machado** had CI-1 write his/her name and provide a phone number on the photocopy of the check. **Machado** ran the cash through a money counter machine and handed the cash to CI-1, minus the 1.75% fee, in a shopping bag. **Machado** never asked CI-1 for identification or any pedigree information. No CTR was ever filed for this transaction. The check was not deposited into any accounts held by **Machado**, **Gomes-Souza**, Via Brazil I, or Via Brazil II. Instead, the check was deposited into a check cashing account held by Company 1.

20. On each occasion CI-1 cashed a check at Via Brazil I or Via Brazil II, the check was deposited into the check cashing account of Company 1. CC1, on behalf of Company 1, filed CTRs indicating large amounts of cash were delivered to **Gomes-Souza** and/or Via Brazil I, but failed to file CTRs listing the payor or payee on the checks cashed as required by law.

21. Based upon this information, there is probable cause to believe

that **Machado** and **Gomes-Souza** obtain their cash from Company 1 and send the checks from Via Brazil I and Via Brazil II customers to Company 1. On a number of occasions, CI-1 cashed checks at the direction of IRS-CI at Via Brazil II (the unlicensed facility) located in Philadelphia. Yet, the CTRs being filed by Company 1 appear as if the transactions were conducted at Via Brazil I (the licensed facility) in Riverside, New Jersey.

22. This is corroborated by law enforcement surveillance and a pole camera. On a typical day, an armored car will deliver cash to Company 1 in Penndel, Pennsylvania in the morning, usually after 10:00a.m. After 11:00 a.m., a Company 1 employee will leave Company 1 with a bag that appears to contain a large sum of cash and drive to the Philadelphia location of Via Brazil II. **Gomes-Souza**, **Machado**, or one of their employees will walk out the back door of Via Brazil II into the alleyway. The Company 1 employee will hand the bag of currency through the driver's window, and **Gomes-Souza**, **Machado**, or an employee will hand an envelope which appears to contain checks into the car. The Company 1 employee will then return to Company 1 with the envelope.

23. For example, a review of the pole cameras showed the following activity on December 4, 2019. At approximately 11:12 a.m., an armored car service employee carried a large duffel bag into Company 1. At approximately 12:18 p.m., a woman ("Employee 1") (believed to be CC1's sister) and a man, ("Employee 2") (believed to be CC1's father), exited Company 1. Employee 1 was carrying a large white plastic bag filled with unknown contents, that, based on the evidence and my training and experience, I believe to be cash. Employee 1 placed the bag into the back seat of a Dodge Ram truck. Employee 2 entered the driver's side of the Dodge Ram and Employee 1 entered the passenger seat and drove away. At approximately 12:48 p.m., the Dodge Ram parked in the alley behind Via Brazil II. **Gomes-Souza** exited Via Brazil II and handed multiple envelopes which, based on my training and experience and the circumstances surrounding this investigation, I believe to contain checks, through the front passenger seat of the Dodge Ram. **Gomes-Souza** then removed the large white plastic bag from the passenger window and walked back into Via Brazil II. The Dodge Ram drove away and arrived back at Company 1 at approximately 1:32 p.m.

24. On December 5, 2019, Employees 1 and 2 arrived at Company 1 in a Chevy Equinox at approximately 9:58 a.m. At approximately 10:20 a.m., an armored car service employee carried a large duffel bag into Company 1. At approximately 12:13 p.m., two Company 1 employees, Employees 3 and 4, exited Company 1. Employee 3 was carrying two large plastic bags containing unknown contents. Based upon my training and experience and the evidence developed in this investigation, I believe the bags contained cash. Employee 4 entered the Equinox driver's seat and Employee 3 entered the front passenger door carrying the bags. At approximately 1:04 p.m., the Equinox parked in the

rear of Via Brazil II. An unknown female exited Via Brazil II carrying a large brown bag and handed an envelope through the front passenger window of the Equinox. The front passenger in the Equinox placed a large white plastic bag into the large brown bag. The unknown female walked back into Via Brazil II carrying the large brown bag, and the Equinox drove away. At approximately 1:27 p.m., the Equinox arrived back at Company 1. Employees 3 and 4 exited the vehicle and entered Company 1. Employee 1 was carrying a thick white envelope.

25. On December 6, 2019, Employees 1 and 2 arrived at Company 1 at approximately 9:53 a.m., driving the Equinox. At approximately 10:46 a.m., an armored car service employee carried a large duffel bag into Company 1. At approximately 12:14 p.m., Employees 3 and 4 exited Company 1 with Employee 3 carrying two large plastic bags, which he placed in the Equinox. Employee 4 entered the driver's seat and Employee 3 the front passenger seat. At approximately 12:47 p.m., the Equinox parked behind Via Brazil II. An unknown female exited Via Brazil II carrying a large brown bag. She handed an envelope through the front passenger window of the Equinox. A white plastic bag was then placed from the Equinox into the large brown bag. The unknown female walked back into Via Brazil II while the Equinox drove away. At approximately 1:32 p.m., Employees 3 and 4 returned to Company 1 in the Equinox. Employee 3 carried a white envelope into the business.

26. Company 1 filed the following CTRs related to the check cashing activity at Via Brazil II identified above between December 4, 2019 and December 6, 2019:

| **Trans. Date** | **Cash Out** | **Subject** | **Address** |
|---|---|---|---|
| 12/4/2019 | $296,127 | **Juliana Gomes-Souza** | [REDACTED ADDRESS] Cinnaminson NJ |
| | | Via Brazil LLC | 241 S. Pavilion Avenue, Riverside NJ |
| 12/5/2019 | $192,472 | Via Brazil LLC | 241 S. Pavilion Avenue, Riverside NJ |
| | | **Juliana Gomes-Souza** | [REDACTED ADDRESS], Cinnaminson NJ |
| 12/6/2019 | $533,746 | **Juliana Gomes-Souza** | [REDACTED ADDRESS], Cinnaminson NJ |
| | | Via Brazil LLC | 241 S. Pavilion Avenue, Riverside NJ |

27. On March 10, 2021, an armored car service employee carried a large duffle bag into Company 1 at approximately 10:25 a.m. At approximately 11:55 a.m., CC1 and Employee 3 exited Company 1 and CC1 was carrying a large plastic bag. CC1 and Employee 3 walked towards a black Nissan Maxima.

At approximately 12:26 p.m., the black Nissan Maxima parked in the rear alley of Via Brazil II. An unknown female exited the rear of Via Brazil II and handed Employee 3 a thick white envelope through the driver side window. Employee 3 then handed the unknown female a large and heavy plastic bag. The unknown female walked back into Via Brazil II with the plastic bag and the black Nissan Maxima drove away. At approximately 1:15 p.m, the black Nissan Maxima pulled into the parking lot of Company 1. Employee 3 walked from the direction of the black Nissan Maxima and entered Company 1 carrying a white envelope in his hand.

28. On March 11, 2021, an armored car service employee carried a large duffle bag into Company 1 at approximately 9:27 a.m. At approximately 1:02 p.m., Employee 3 arrived at Company 1 in the black Nissan Maxima. Employee 3 entered Company 1 and after a few minutes got back into the black Nissan Maxima and exited the area. Employee 3 walked towards a black Nissan Maxima. At approximately 1:39 p.m., the black Nissan Maxima parked in the rear alley of Via Brazil II. An unknown female exited the rear of Via Brazil II and handed Employee 3 a thick white envelope through the driver side window. Employee 3 then handed the unknown female a large and heavy plastic bag. The unknown female walked back into Via Brazil II with the plastic bag and the black Nissan Maxima drove away. At approximately 2:26 p.m, the black Nissan Maxima pulled into the parking lot of Company 1. Employee 3 walked from the direction of the black Nissan Maxima and entered Company 1 carrying a white envelope in his hand.

29. On March 12, 2021, an armored car service employee carried a large duffle bag into Company 1 at approximately 12:27 p.m. At approximately 12:54 p.m., CC1 and Employee 3 exited Company 1 and CC1 was carrying a large plastic bag. CC1 and Employee 3 walked towards a black Nissan Maxima. After a few moments, CC1 walked back into Company 1 empty handed and Employee 3 pulled away in the black Nissan Maxima. At approximately 1:46 p.m., the black Nissan Maxima parked in the rear alley of Via Brazil II. CC2, a known male co-conspirator, and an unknown female exited the rear of Via Brazil II. The unknown female handed Employee 3 a thick white envelope through the driver side window. Employee 3 then handed the unknown female a large plastic bag. The unknown female walked back into Via Brazil II with the with the large plastic bag. Employee 3 then handed CC2 a thick white envelope. Employee 3 and CC2 talked for a few minutes and then shook hands. Employee 3 pulled away in the black Nissan Maxima. At approximately 2:15 p.m, the black Nissan Maxima pulled into the parking lot of Company 1. Employee 3 walked from the direction of the black Nissan Maxima and entered Company 1carrying a white envelope in his hand.

30. Company 1 filed the following CTRs related to the check cashing activity at Via Brazil II identified above between March 10, 2021 and March 12, 2021:

| Trans. Date | Cash Out | Subject | Address |
|---|---|---|---|
| 3/10/2021 | $328,472 | Via Brazil LLC | 241 S. Pavilion Avenue, Riverside NJ |
| | | **Juliana Gomes-Souza** | [REDACTED ADDRESS], Cinnaminson NJ |
| 3/11/2021 | $113,445 | **Juliana Gomes-Souza** | [REDACTED ADDRESS], Cinnaminson NJ |
| | | Via Brazil LLC | 241 S. Pavilion Avenue, Riverside NJ |
| 3/12/2021 | $239,806 | Via Brazil LLC | 241 S. Pavilion Avenue, Riverside NJ |
| | | Juliana Gomes-Souza | [REDACTED ADDRESS], Cinnaminson NJ |

31. On May 4, 2022, at approximately 11:25 a.m., an armored car service employee entered Company 1 carrying a large duffel bag. At approximately 11:40 a.m., Employee 3 left Company 1 carrying a large plastic bag and entered a black Nissan Maxima. At approximately 12:07 p.m., Employee 3 drove into the alley behind Via Brazil II. Employee 3 then handed the large white plastic bag of what I believe to be cash to **Gomes-Souza** in exchange for a white envelope which I believe contained checks. **Gomes-Souza** then walked into the rear entry of Via Brazil II and Employee 3 departed in the black Maxima.

32. On May 5, 2022, at approximately 9:30 a.m., an armored car service employee made a cash delivery to Company 1. At approximately 10:35 a.m., Employee 3 exited Company 1 carrying a large plastic bag. Employee 3 placed the bag in the black Maxima and drove away. At approximately 12:07 p.m., Employee 3 pulled into the alleyway behind Via Brazil II. Employee 3 gave the large plastic bag of suspected cash to **Gomes-Souza**, who then gave Employee 3 an envelope, believed to be checks, to Employee 3. **Gomes-Souza** then walked back into Via Brazil II and Employee 3 drove away.

### D. Conclusion

33. Based on my training and experience and my review of the evidence in this case, there is probable cause to believe that **Gomes-Souza**, **Machado** and their co-conspirators are operating Via Brazil I and Via Brazil II as a criminal scheme which avoids the reporting and registration requirements of state and federal law, allowing over $175 million in cash to be dispersed to

their customers without the creation of traceable financial records.